UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 9:21-CV-82125-MIDDLEBROOKS/MATTHEWMAN

**ELSA CUELLAR,** individually and
on behalf of those similarly situated,

       **Plaintiff,**

**vs.**                                 **DEMAND FOR JURY TRIAL**

**SPECIALIZED LOAN SERVICING, LLC**,

       **Defendant.**
_____/

## AMENDED CLASS ACTION COMPLAINT

Plaintiff, ELSA CUELLAR ("Cuellar"), by and through her counsel, Scott Hirsch Law Group, PLLC, The Advocacy Group, and Gustafson Gluek PLLC ("Counsel"), bring this class action lawsuit for violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq*. (the "FDCPA"), and Section 559.72(9), Florida Statutes ("Florida Consumer Collection Practices Act" or the "FCCPA"), in accordance with the allegations set forth in the numbered paragraphs that follow.

## NATURE OF THE ACTION

1.    This is a putative class action brought under rule 23 of the Federal Rules of Civil Procedure by Plaintiff Russell, on her own behalf and on behalf of all others similarly situated, against one of the country's largest loan servicers, SPECIALIZED LOAN SERVICING, LLC ("Defendant" or "SLS").  SLS is employed by lenders to "service" mortgages on their behalf. Plaintiff and the Class Members are homeowners whose homes have been in foreclosure. SLS is servicer of the mortgage loans which encumber Plaintiff's and Class Members' homes. As a servicer, SLS regularly acts as a debt collector.

## PARTIES JURISDICTION AND VENUE

7.  Plaintiff, ELSA CUELLAR is an individual citizen of the State of Florida, residing in Palm Beach County.  At all times material, she owns and has occupied the property at issue, located at 12988 61st Street North, West Palm Beach, Florida 33412 (the "Subject Property").

8.  Defendant, SLS is a Delaware limited liability corporation with its principal place of business in Highlands Ranch, Colorado.  At all times material, Defendant SLS is and was a loan servicer as that term is defined in 12 U.S.C. § 2605(i)(2) and 12 C.F.R. § 1024.2(b).  Moreover, SLS services the loan obligation that's secured by a mortgage upon the Subject Property.

9.  The subject loan is a "federally related mortgage loan" as defined in 12 U.S.C. § 2602(1) and 12 C.F.R. § 1024.2(b) and referred to by Defendant SLS as account number ******3834.  A copy of the applicable note and mortgage loan documents encumbering the Subject Property are attached as Exhibit A.

10.  The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises out of the FDCPA, a federal statute. The Court also has supplemental jurisdiction over the FCCPA claim under 28 U.S.C. § 1367, because this claim is so related to the federal FDCPA claim that they form part of the same case or controversy under Article III of the United States Constitution.

11.  This Court has general diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity between the Plaintiff and Defendant.  This Court also has jurisdiction over this matter pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§1332(d). CAFA's requirements are satisfied in that (1) the members of the Class exceed 100; (2) the citizenship of at least one proposed Class member is different from that of the Defendant; and (3)

the matter in controversy, after aggregating the claims of the proposed Class members, exceeds $5,000,000.00, exclusive of interest and costs.

12.     Venue is proper in the United States District Court in and for the Southern District of Florida pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in this district.

## LEGAL FRAMEWORK APPLCABLE TO THE CLAIMS

## FDCPA STATUTORY STRUCTURE

13.     The purpose of the FDCPA is "to eliminate abusive debt collection practices . . . to promote consistent State action to protect consumers against debt collection abuses…" 15 U.S.C. § 1692.

14.     The FDCPA generally prohibits debt collectors, including SLS, from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt" [§ 1692e], and the use of "unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f, including, but not limited to:

   a.   False representations or misrepresentations of "the character, amount, or legal status of any debt." *Id.* at § 1692e(2)(A);

   b.   False representations or misrepresentations of any "compensation which may be lawfully received by [the] debt collector for the collection of a debt." *Id*. at § 1692e(2)(B);

   c.   "The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." *Id.* at § 1692f (1); and

    d.  "The use of any false representation or deceptive means to collect or attempt to collect" a debt. *Id.* at § 1692e (10).

## FCCPA STATUTORY STRUCTURE

15.     The purpose of the FCCPA is to "provide the consumer with the most protection possible." *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1192 (11th Cir. 2010) (citing § 559.552, Fla. Stat.).

16.     Like the FDCPA, the FCCPA prohibits persons, including SLS, from engaging in certain abusive practices in the collection of consumer debts. *See generally* § 559.72, Fla. Stat.

17.     Specifically, the FCCPA states that no person, including SLS, shall "claim, attempt, or threaten to enforce a debt when such person knows that the debt is not legitimate, or assert the existence of some other legal right when such person knows that the right does not exist." § 559.72(9), Fla. Stat. The FCCPA defines both "debt" and "consumer debt" as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." § 559.55(6). A "consumer" is defined as "any natural person obligated or allegedly obligated to pay any debt." § 559.55(8).

## GENERAL BACKGROUND

18.     SLS is an entity that at all relevant times was engaged in the business of attempting to collect a "debt" from Plaintiff, as defined by 15 U.S.C § 1692a(5) and by Fla. Stat. § 559.55(7).

19.     SLS is a "debt collector" as defined in the FDCPA, § 1692a(6) and Fla. Stat. § 559.55(7), in that it acquired the servicing of the loans at issue after default and uses the U.S. Mail in a business for the principal purpose of which is the collection of any debts, or who regularly

collects or attempts to collect, directly or indirectly, debts owed or asserted to be owed or due by another.

20.     SLS is a mortgage loan servicer that regularly services mortgage loans in Florida, including loans owned or assigned by Fannie Mae/Freddie Mac.

21.     The loan servicer's duties and obligations are clearly filled in and defined by the Fannie Mae or Freddie Mac written Seller/Servicer Guidelines (the "Guidelines") when the loan is either serviced by the lender itself or sold to third-party servicer entities.

22.     In this instance, the loans at issue affecting Plaintiff and the Class Members are serviced by SLS; therefore, SLS is required to comply with all servicing guidelines.

23.     In its role as mortgage loan servicer, SLS was responsible for preparation of items concerning the Note and Mortgage including, but not limited to, preparing and sending monthly statements, accounting for credit and debits on the Note, calculating, collecting, and disbursing escrow amounts, sending notices, responding to Qualified Written Requests ("QWRs"), Notice of Errors ("NOEs") and Requests for Information ("RFIs") pursuant to the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601, *et seq*. ("RESPA") and Regulation X, overseeing the judicial foreclosure process including providing information for the same, and calculating payoff figures and transmitting payoff figures.

24.     Payoff statements generated by SLS are unform in composition and form.

25.     SLS is a mortgage "servicer" as that term is defined by 12 C.F.R. § 1024.2(b) and 12 U.S.C. § 2605(i)(2).  As stated above, SLS is the current servicer of the notes and mortgages on real property that secure those notes, owned by Plaintiff and the Members of the Class.

I.     **Mortgages Contain Largely Uniform Obligations and Requirements for Loan Servicers**

26.     Virtually all mortgage loans originated in the United States use either the standardized Fannie Mae/Freddie Mac Security Instrument (the "Fannie/Freddie Mortgage") or the Federal Housing Authority ("FHA") Deed of Trust. This is because at origination, the originating bank/lender must use these forms to have the possibility of selling the mortgage to Fannie/Freddie, which are the largest holders of mortgages in the United States. If the standardized forms are not used, Fannie/Freddie will not purchase the loan from the originator.

27.     While the Fannie/Freddie forms are not identical for each state, they contain sections which are uniform and do not change from state to state. Importantly, the sections of Fannie/Freddie mortgages at issue in this case are the sections that are uniform on a nationwide basis.

28.     When the mortgage loan is sold in the secondary market, for example to Fannie/Freddie, or to private investors through a Mortgage-Backed Security ("MBS"), the Servicing Rights are separated from the principal and interest income stream rights, and the Servicing Rights are either retained by the originating lender or acquired by a third-party loan servicer. A Fannie Mortgage clarifies the distinction between the "Lender" and the "Loan Servicer." The "Lender" is the originating Lender who provides the funds to the Borrower in return for repayment plus interest, i.e., the owner of the note. The Loan Servicer need not be the mortgage originator, but as explained below, the Loan Servicer provides specific circumscribed services in exchange for statutorily regulated fees.

29.     Importantly, the Fannie Mae/Freddie Mac Mortgage draws an additional sharp distinction between the "Lender" and the "Loan Servicer." Specifically, the "Lender" funds the loan and is entitled to repayment of principal and interest. The "Loan Servicer" "collects Periodic

Payments due under the Note and … Security Instrument and performs other mortgage loan servicing obligations …"

30.     The Loan Servicer's duties and obligations are clearly filled in and defined by the Fannie Mae or Freddie Mac written Seller/Servicer Guidelines (the "Guidelines") when the loan is either serviced by the lender itself or sold to third-party servicer entities.

31.     The loans at issue affecting the Plaintiff and the Class Members are serviced by SLS; therefore, SLA is required to comply with all servicing guidelines.

**A.  Effect of a Borrower's Default and SLS's Source of Extra Fees**

32.     As explained more fully below, SLS in its role as Loan Servicer, has an economic incentive to push borrowers into default, an interest that is misaligned with borrowers and SLS's role as Lender.

33.     In the ordinary course, in the event of a default by the borrower, the Government Sponsored Enterprise/Mortgage-owner (i.e., the Lender) suffers the principal loss.  However, since the loan in this instance is securitized, the Lender, has shifted its risk to the investors and in fact profits on the securitization transaction.  Furthermore, if the Loan Servicer advanced payments on taxes, insurance premiums or other default/foreclosure related costs (including, without limitation, property inspections), the Loan Servicer does not suffer a loss of those advances in the event of foreclosure. Rather, the Lender reimburses the Loan Servicer for the outstanding amount.

34.     The Loan Servicer's risk of loss in the event of a borrower's default and foreclosure is limited to a loss of the right to receive future servicing fees on the loan. In the event of default and foreclosure, Loan Servicers also stand to collect additional fee income including late fees, attorney fees, foreclosure fees, etc., that exceed the value of the servicing fees paid. If the Loan Servicer manages to work with the borrower to modify or refinance the delinquent loan, the Loan

Servicer typically receives a fee (i.e., from the U.S. Treasury) in connection with that outcome as well.

35.     The potential loss of base servicing fees can pale in comparison to the ancillary fee compensation received by the Loan Servicer in connection with default servicing activities. Indeed, where the compensation received in connection with default servicing activities is greater than the present value of servicing fees—as is often the case—the Loan Servicer has a greater interest in forcing borrowers into (and ensuring they stay in) default than it has in granting a modification or restoring the account to a fully performing loan.

36.     SLS earns revenue from mortgage loan servicing in three principal ways. First, SLS receives a fixed fee for each loan which is determined by the servicing agreements between SLS and the investors or note holders.

37.     Second, SLS earns "float" income from accrued interest between when consumers pay and when those funds are remitted to Lenders, taxing authorities, insurers, and other relevant parties.

38.     Third, SLS receives ancillary fee income that includes, without limitation, late charges paid by borrowers, workout and modification incentive fees, and other delinquency-related fee income including, for example, the property inspection or "home preservation" fees at issue here.

39.     Two important sources of ancillary fee income for SLS are property inspection fees, and late fees. As described more fully herein, each time SLS inspects the property and assesses a property inspection fee on a borrower, the borrower must pay an additional $15.00 (the amount SLS presently charges) to become current. If the borrower fails to become current, SLS imposes additional late fees on the borrower.

40.     This practice makes it more difficult for distressed borrowers to become current and leads many borrowers into foreclosure proceedings and/or to modify their loan. As explained above, this serves SLS's interests. Because Loan Servicers like SLS can generate more revenue from loan servicing activities and fees then from principal and interest payments made by borrowers, Loan Servicers have a vested interest in generating revenue through so-called default servicing activities and corresponding ancillary fees.

41.     Some of these fees, such as late fees, are pure profit for the Loan Servicer. Other fees permit the Loan Servicer to generate additional income by delegating the task to an affiliated entity or entity that returns a profit to the Loan Servicer.

42.     Furthermore, because SLS is able to generate more loan servicing income through default servicing activities as compared to ensuring that borrowers make timely payments on the mortgage to the benefit of the owner/investor of the loan, SLS is incentivized to keep borrowers in default, which is contrary to the interests of borrowers. Indeed, according to one member of the Board of Governors of the Federal Reserve System, "a foreclosure almost always costs the investor [of the loan] money, but [it] may actually earn money for the servicer in the form of fees."[1]

43.     One template for determining the reasonableness of the tasks and charges undertaken by the Loan Servicer are the guidelines, rules and/or regulations issued by the Lender that set forth the Loan Servicer's obligations with respect to the specific tasks at issue. None of these documents suggest that it is appropriate to inspect a property more than once during a 30-day period, if at all, or after the borrower has come current.  Rather, it is SLS's unilateral and self-serving determination *en masse* that conducting these excessive property inspections is

---

[1] Governor Sarah Bloom Raskin, "Problems in the Mortgage Servicing Industry," Board. of Governors of the Federal Reserve System (Nov. 12, 2010), *available*:
http://www.federalreserve.gov/newsevents/speech/raskin20101112a.htm.

"appropriate" regardless of the borrower's underlying circumstances or any objective criterion related to the circumstances surrounding particular loans.

44.     Given this conflict of interest with the borrowers, even though the loan servicing and default servicing tasks performed by SLS are purportedly to protect their interests as Lender, the fees charged for these services are excessive and in violation of the mortgage agreement, servicing guidelines and applicable laws.

## II.     Property Inspections on Defaulted Loans

45.     Loan Servicers perform "servicing" tasks on behalf of the Lender that holds the loan.

46.     The tasks a Loan Servicer performs include collecting monthly payments, monitoring insurance coverages, and ensuring that taxes are paid. Loan Servicers are also responsible for taking action to protect the properties securing loans when certain triggering circumstances arise, e.g., securing a property that has been abandoned to avoid damage to that property.

### A.    Servicing Guidelines by Owner/Investor Control Appropriate Loan Servicing Activities

47.     The tasks Loan Servicers perform, and the standards Loan Servicers are supposed to adhere to in performing these tasks are determined by owner/investor guidelines. For example, Fannie Mae, Freddie Mac and HUD each issue written servicing guides that delineate the tasks that Loan Servicers must perform, and standards applied in evaluating Loan Servicer performance. Failure to comply with these guidelines is probative of a failure on the part of the servicer to comply with state consumer protection laws. *See Davidson v. Seterus, Inc*., 21 Cal. App. 5th 283, 289, 230 Cal. Rptr. 3d 441, 443 (2018). Loan Servicers are also bound by the terms of the mortgage contracts and applicable laws and regulations.

48.     The provisions of the Fannie Mae and Freddie Mac Guidelines referencing property inspections do not require or suggest that Loan Servicers order property inspections more frequently than once every 30 days, nor do they authorize inspections after the borrower has remedied their default/come current on their loan.

49.     For example, Section D2-2-10 of the 2021 Fannie Mae Servicing Guidelines, Fannie states:

> The servicer must order the initial property inspection on or after the 60th day of delinquency and complete the property inspection no later than the 75th day of delinquency for all delinquent mortgage loans. The following table outlines the servicer's responsibilities for initiating and continuing property inspections on a property securing a delinquent mortgage loan.
>
> The servicer must complete [a] property inspection every calendar month as long as the mortgage loan remains 60 or more days delinquent **unless the property is borrower occupied** and one of the following has occurred:
>
> • QRPC [Quality Right Party Contact] has been established within the last 30 days,
> • a full payment has been received within the last 30 days,
> • a repayment plan or a Trial Period Plan has been approved and the borrower is performing the plan, or
> • the borrower is performing under the applicable bankruptcy plan.[2]

50.     This provision is necessary to ensure the property is occupied when the Loan Servicer has been *unable to establish contact with the borrower* and loan payments have not been received. Plainly, the provision does not authorize or permit inspections when the Loan Servicer is in contact with the borrower and knows the property to be inhabited, or after the borrower has come current.

51.     The Fannie Mae Guidelines also does not authorize or permit inspections when the Loan Servicer is in contact with the borrower and knows the property to be inhabited.

---

[2] https://servicing-guide.fanniemae.com/ (emphasis added) published October 13, 2021.

52.     Plaintiff had either been in contact with SLS and achieved QRPC under the Fannie Mae/ Freddie Mac Guidelines. Yet, SLS continued ordering property inspections *well after* they knew that a QRPC with Plaintiff was established.

53.     As further detailed below, despite having direct evidence that the property was continually occupied by Plaintiff, the borrower, and not at risk of being damaged or neglected, SLS continued ordering and charging for unnecessary and illegal property inspections.

54.     Fannie Mae and Freddie Mac have not taken action to prevent SLS's violations of the guidelines because they rely on Loan Servicers to police themselves. As explained by the Federal Housing Finance Agency ("FHFA"), the conservator of Fannie Mae and Freddie Mac:

> [Fannie Mae and Freddie Mac] use a delegated business model to buy and service mortgage loans. In this model, they contract with third-party mortgage loan sellers and/or servicers (e.g., counterparties, such as banks) that are relied on to comply with their requirements for ... servicing the ... loans [purchased or guaranteed by Fannie Mae or Freddie Mac] (e.g., collecting payments); and [] reporting data about the loans. As a result of relying on the counterparties for compliance and reporting, [Fannie Mae and Freddie Mac] run the risk of their counterparties failing to meet their respective ... servicing guidelines.[3]

55.     The Office of Inspector General for the FHFA then wrote:

> In the mid-1990s, one of the Enterprises required an independent, third-party assurance of counterparties' compliance with some elements of its guidelines, but this requirement was *replaced by reliance on counterparties' self-representations of their compliance*. Further, the Enterprises have risk-based, internal oversight of their counterparties' compliance with selling and servicing guidelines *but most receive no onsite review*.[4]

56.     The OIG of the FHFA has also previously found that Fannie Mae and Freddie Mac "do not ensure counterparties' business practices follow all federal and state laws and regulations

---

[3] Letter from Russell A. Rau, Deputy Inspector General for Audits of the FHFA, to Nina Nichols, Deputy Director for Enterprise Regulation, Audit of FHFA's Oversight of Risks Associated with the Enterprises Relying on Counterparties to Comply with Selling and Servicing Guidelines (Sept. 26, 2014) ("Counterparty Risk Letter"), at 1, *available* at https://www.fhfaoig.gov/Content/Files/AUD-2014-018.pdf (last visited April 19, 2021).
[4] Counterparty Risk Letter (emphasis added), at 1.

designed to protect consumers from unlawful activities."[5] "In addition, OIG identified that [Fannie Mae and Freddie Mac] do not have a formal monitoring program in place to review their counterparties' compliance with the federal and state laws that govern servicing mortgage loans. Instead, [Fannie Mae and Freddie Mac] rely primarily on counterparty self-certifications of contractual compliance along with federal regulators' supervisory and enforcement activities."[6]

57.     Additionally, the OIG of the FHFA determined that the Loan Servicers and the inspectors they used routinely charged borrowers for inspections that never took place due to the properties being in a gated community, and that these "inspections" provided no useful information:

> OIG found that inspectors conducted unnecessary inspections that did not report useful information to the servicer. In one case, the inspector conducted inspections of a property in a gated community—closed to the public. For 12 consecutive months, the inspector did not obtain access to the restricted property and billed the servicer for 12 property inspections conducted from outside the gated community. None of these inspection reports contained useful information—e.g., occupancy and security status, condition, and description—which prevented the servicer from properly monitoring the status of the delinquent property for an entire year.[7]

1. **Mortgage Contracts Establish the Legal Limits of a Loan Servicer's Powers to Conduct Property Inspections**

58.     Mortgage loan contracts establish the parameters of the relationship between and among a borrower, the Lender, and Loan Servicer. The mortgage contracts have provisions that

---

[5] Counterparty Risk Letter, at 11.

[6] *Id. See* also FHFA OIG, *FHFA Should Develop and Implement a Risk-Based Plan to Monitor Oversight of Their Counterparties Compliance with Contractual Requirements Including Consumer Protection Laws* (Mar. 26, 2013), available at http://www. Fhaoig.gov/Content/Files/Aud-2013-008; Letter from Steve A. Linick, Inspector General of FHA to Edward J. DeMarco, Director, Systemic Implication Report: Oversight of Property Preservation Inspections (Nov. 26, 2012), *available* at https://www.fhfaoig.gov/sites/default/files/SIR%20FINAL%20Enterprise%20Oversight%20of%20Property%20Preservation_0.pdf (uncovering fraud by property inspection vendor and questioning whether Fannie Mae and Freddie Mac had sufficient protections in place to detect fraud).

[7] *See* FHFA OIG, *FHFA Oversight of Enterprise Controls Over Pre-Foreclosure Property Inspections* (Mar. 25, 2014), *available* at https://www.fhfaoig.gov/Content/Files/AUD-2014-012.pdf

govern when a Loan Servicer can order property inspections and charge a borrower for the cost of such inspections.

59.     According to Paragraph 7 of the standard Fannie/Freddie Mortgage, the Lender or its agent "may make reasonable entries upon and inspections of the Property." The Fannie/Freddie Mortgage further provides, at Paragraph 9, that if the "Borrower fails to perform the covenants and agreements contained in [the mortgage agreement] ... or Borrower has abandoned the Property, then Lender may do and pay for whatever is *reasonable or appropriate* to protect Lender's interest in the Property and rights under [the mortgage agreement] including protecting and/or assessing the value of the Property" (emphasis added). The form mortgage provides that any amount disbursed by the Lender for taking action under paragraph 9 becomes additional debt of the borrower.

60.     Loan Servicers of loans owned or guaranteed by Fannie Mae or Freddie Mac must follow the standards and procedures of the Fannie Mae and Freddie Mac Servicing Guidelines. Thus, these Guidelines clarify what is "reasonable or appropriate" under Paragraphs 7 and 9 of the Fannie Mortgage.

**B. Laws and Regulations Govern Loan Servicing Activities Including Property Inspections**

61.     Certain federal regulations and state laws govern whether Loan Servicers, including SLS, may order a property inspection and charge the inspection to a borrower.

62.     For example, the United States Department of Housing and Urban Development imposes a limitation on Loan Servicers' ability to order property inspections and charge them to borrowers. Specifically, 24 C.F.R. § 203.377, which provides, in pertinent part:

> The mortgagee, upon learning that a property subject to a mortgage insured under this part is vacant or abandoned, shall be responsible for the inspection of such property at least monthly, if the loan thereon is in default. When a mortgage is in

default and a payment thereon is not received within 45 days of the due date, and efforts to reach the mortgagor by telephone within that period have been unsuccessful, the mortgagee shall be responsible for a visual inspection of the security property to determine whether the property is vacant. The mortgagee shall take reasonable action to protect and preserve such security property when it is determined or should have been determined to be vacant or abandoned until its conveyance to the Secretary, if such action does not constitute an illegal trespass. "Reasonable action" includes the commencement of foreclosure within the time required by § 203.355(b) of this part.

63.     A bankruptcy court in the Eastern District of Pennsylvania ruled that Section 203.377 of the federal regulations trumps any provision to the contrary in FHA Mortgages.  *See In re Ruiz*, 501 B.R. 76 (Bkrtcy. E.D. Pa. 2013). In *Ruiz*, the court ruled that notwithstanding the Loan Servicer's argument that the mortgage permitted inspections solely on the basis of default, the federal regulation controlled.

64.     By automatically ordering and carrying out default-related property inspections regardless of occupancy status, the condition of the property, or any risk of abandonment, SLS has been in blatant violation of Fannie Mae/ Freddie Mac guidelines.

**C.  SLS's Improper Property Inspection Practices**

65.     As part of is mortgage servicing practices, SLS utilizes an automated and computerized loan servicing platform that is programed to automatically and systematically take specific steps in response to various triggers that may occur in the loan servicing process. SLS intentionally uses this automated loan servicing platform that automatically triggers orders for property inspections whether or not they are needed or permitted under the terms of the SLS's agreements.

66.     SLS claims that it engages in property inspections only under certain agreed-upon circumstances and only to ensure that the property has not been damaged or abandoned when, in

fact, these inspections are conducted and billed automatically, whether they are necessary for the preservation of the property and permitted by contract, or not.

67.     Moreover, SLS claimed, through the issuance of monthly statements and other demands for payment, that the fees charged for property inspections ordered by SLS were fair, lawful, and reasonable when, in fact, they are the consequence of an unlawful scheme to mark-up property inspection fees solely to enrich SLS outside the scope of its contractual agreements.

68.     SLS's scheme takes advantage of the current structure of the mortgage industry. While the mortgage documents and Lender guidelines permit and, in some circumstances, require the Loan Servicer to conduct certain property inspections, SLS's unlawful practices ignore these guidelines and imposes, without limitation: (a) unfair and excessive property inspections that are not permitted by mortgage documents; (b) more property inspections than are required; (c) more property inspections than are permitted by federal regulations and state laws; (d) more property inspections than are warranted by the circumstances of any actual loan—i.e., without any regard for whether the property is occupied or any other factor that would make inspections warranted; and (e) impermissibly inflates charges for property inspections– some of which never occur.  SLS engages in this scheme with minimal risk because Fannie Mae/ Freddie Mac agrees to reimburse SLS for the property inspection charges in the event that the borrower does not pay them.[8]

69.     The SLS fraudulent and improper property inspection scheme has harmed Plaintiff and the Class because: (1) they are charged for multiple, unnecessary, unreasonable, or otherwise unlawful drive-by inspections; and (2) SLS counts on the bogus inspection charges going unpaid

---

[8] Fannie Mae's current servicer guidelines allow for reimbursement of $15 per exterior property inspection.  *See https://servicing-guide.fanniemae.com/THE-SERVICING-GUIDE/Part-F-Servicing-Guide-Procedures-Exhibits-Quick-Referen/Chapter-F-1-Servicing-Guide-Procedures/F-1-05-Expense-Reimbursement/1045188371/F-1-05-Expense-Reimbursement-03-10-2021.htm#Defined.20Expense.20Reimbursement.20Limits*

due to the borrower's default status, and as a result tacks on additional fees, thus causing a debt spiral, rendering it difficult, if not impossible for the defaulted borrower to become current.

70. Due to the high volume of loans SLS services, thousands of borrowers have been victims of the SLS's property inspection fee scheme.

71. Specifically, the SLS property inspection scheme works as follows: When a borrower misses a loan payment, or a loan otherwise becomes in default, SLS's loan servicing platform automatically, and without regard to owner/investor (i.e. Fannie Mae or Freddie Mac) guidelines and/or actual need, orders property inspections that are excessive in frequency and price, or otherwise unfair. Based upon SLS's practices the loan need not technically be in default under the terms of the mortgage agreement for the property inspections to be ordered.

72. Through the use of its automated system, SLS orders the property inspections which in turn generate work orders to its field service affiliates, who complete purported inspections, but in reality, merely drive by the property and check for signs of residency ("drive-by inspections"), if that. In many instances, the "inspection" is illusory or fabricated, because it is impossible even to do a drive-by inspection on the property because of, *e.g.*, gated communities.

73. SLS pays its affiliate, and then charges borrowers' accounts for the inspections. However, SLS does not transparently disclose these inspections fee charges on a standard mortgage statement for every instance they are performed. Indeed, absent a specific request by the borrower for either a loan history statement or a payoff quote, SLS does not consistently disclose these inspection charges. Instead, the charges are lumped into a category of "other advances" on the monthly mortgage statement, without explanation. This results in SLS reaping thousands of dollars from borrowers who are unlikely to know of and challenge the fees when fighting to save their homes.

74.     What makes SLS's scheme more outrageous is the fact that loan insurers, such as Fannie Mae, specifically agree to reimburse loan servicers, in this case SLS, for all property inspections the servicer must perform on a delinquent mortgage.  What that plainly means is that regardless of whether the Borrower is able to crawl their way out from the additional fees SLS has heaped upon their loan balance, SLS can continue to foreclose on the loan.  The result is SLS can obtain a foreclosure judgment for the amount of the loan plus the default service fees, which include the property inspection fees, and sell the property at a foreclosure sale.  Either way SLS reaps thousands of dollars in improper and fraudulent inspection fees completing dubious and unnecessary drive-by or fabricated inspections.

75.     As the United States Bankruptcy Court for the Eastern District of Louisiana held *In re Dorothy Chase Stewart*, No. 07-11113, 2008 WL 2676961 (Bkrtcy. E.D. La. July 9, 2008), a bank's practice of using computer software to automatically trigger property inspections once a borrower is a certain number of days in default -- and to continuously order those inspections thereafter until the default is cured -- is neither necessary nor reasonable as this practice is not designed to protect the lender's interest in the property. Rather, these automatic inspections are actually conducted to generate additional fees and thereby create more "float" income, boosting the bank's bottom line.

76.     It is hardly coincidental that the service fees assessed for these default-related inspections -- bearing interest at the Note rate from the date of disbursement -- can make it impossible for borrowers to become current on their loans. Fees for default-related services can add thousands of dollars to borrowers' mortgages over time, with interest continuously accruing on the charges, driving them further into delinquency and debt.

77.     Even if the borrowers pay the delinquent principal and interest, the accumulated fees for debt related services, such as the unnecessary property inspections, ensure that the borrowers will most likely stay in default. This is so because, even after the borrower pays the delinquent principal and interest, although the next payment comes in on time, *part of the payment is applied to the fees,* therefore there is not enough to cover the entire monthly payment. This causes the partial payment to become past-due, creating a cascade of more inspection fees, and more arrears, ineluctably leading to SLS threatening to file a foreclosure action unless a huge payment is made.

78.     By sending out monthly mortgage statements referencing charges for purported default-related property inspections, SLS is representing to the delinquent borrowers that each inspection fee is reasonable and necessary. However, that representation is false.  Having worked with its affiliates, such as Safeguard Properties to devise and implements policies and systems for the automated assessment of property inspection fees, SLS knows that its inspection fees are neither reasonable nor necessary.

79.     SLS's property inspection scheme is successful as (1) SLS uses its affiliates as a go-between for drive-by and fabricated inspections; (2) SLS systematically and automatically causes the inspections to be ordered, whether they are needed, permitted, or lawful, or not; and (3) loan investors/insurers (such as Fannie Mae) rely on SLS to follow their guidelines and government regulations, but cannot or do not police SLS's activities for compliance.

80.     Plaintiff and Class Members are harmed by the scheme because (1) they are charged for multiple, unnecessary, unreasonable, or otherwise unlawful drive-by inspections; and (2) because SLS counts on the bogus inspection charges going unpaid due to the borrower's default

status, and as a result tack on additional late fees, thus causing a debt spiral, rendering it difficult, if not impossible for the defaulted borrower to become current.

81.     As a result of the property inspection scheme, SLS has obtained Plaintiff's and the Class' money, as well as increased their debt obligations without justification and contrary to applicable law.

### PLAINTIFF'S ALLEGATIONS

82.     On January 8, 2007 Plaintiff Cuellar purchased the Subject Property secured by an interest only adjustable rate promissory note and adjustable rate mortgage in the amount of $360,500.00 in favor of Countrywide Home Loans, Inc. as lender.  *See* Exhibit A previously attached. Thereafter, the note and mortgage agreement was assigned to The Bank of New York Mellon FKA The Bank of New York as Trustee for the certificateholders of the CWABS, Inc., Asset-Backed Certificates, Series 2007 1 ("BNY") for which the servicing rights of the mortgage loan for the subject property were assigned to SLS by them.

83.     Due to financial hardship, Plaintiff became delinquent and defaulted on her mortgage.

84.     On August 16, 2017, BNY instituted foreclosure proceedings in the Circuit Court of the Fifteenth judicial Circuit in and for Palm Beach County, Case No: 502017CA0092858XXXXMB.

85.     On or about July 6, 2021 Plaintiff, through her authorized agent, sent a written request to SLS for an accurate payoff statement pursuant to 12 C.F.R. § 1026.36(c)(3) (the "1st payoff request").

86.     On or about June 16, 2021, SLS responded to Plaintiff's 1st payoff request by sending Plaintiff a letter entitled "VA/Conv Payoff Statement Amended" (hereinafter, the "payoff

letter").  However, Defendant SLS's June 16, 2021 payoff letter was inaccurate as it contains a line item of charges which are completely vague and identified only as "Corp. Advances."  The composition and the amounts comprising the charges for "Corp. Advances" is not itemized or disclosed.  There is no explanation provided concerning the ambiguously labeled "Corp. Advances."  Indeed, there is no indication that the amounts of the charges contained within the "Corp. Advances" are estimates or were actually incurred or even owed by Plaintiff.  A copy of SLS's June 16, 2021 payoff letter is attached hereto as Exhibit B.

87.     SLS is fully aware and has actual knowledge that the standard mortgage loan agreements it services, including those of the Plaintiff, do not authorize the charging of fees which are estimates or not actually incurred such as those contained in the "Corp. Advances." Specifically, as servicer, SLS has direct access to and copies of the standard mortgage loan agreements for Plaintiff and the Members of Class.  SLS as a sophisticated and experienced servicer has actual knowledge of the types and amounts of fees it is allowed to charge pursuant to both the standard mortgage loan agreement and the servicing guidelines it is bound by.

88.     SLS knows that demands for payment containing the non-itemized amorphous charge of "Corp. Advances" is misleading as it does not give consumers, such as Plaintiff and Class Members, the ability to knowledgably assess the validity of the claimed debt.

89.     Additionally, these demands for fees for "Corp. Advances" were a direct breach of each of the following provisions permitting only recovery of amounts actually incurred: (1) Paragraph 9 of the standard mortgage loan agreement permitted SLS to recover "amounts disbursed" in protecting the lender's interest and rights in the standard mortgage loan agreement; (2) Paragraph 14 of the standard mortgage loan agreement prohibited SLS from charging estimated fees, unauthorized fees, or excessive fees, stating '[l]ender may not charge fees that are expressly

prohibited in this Security Instrument or by Applicable Law"; and (3) Paragraph 22 of the standard mortgage loan agreement permitted SLS to collect "expenses incurred in pursuing" certain actions under the Paragraph which governed default, notice of default, actions to cure default, and reinstatement of loans.

90.     Therefore, SLS also knew demanding payment of these fees was not permitted because it violated the very mortgage loan agreements it serviced.

91.     As SLS's June 16, 2021 payoff letter did not represent an "accurate" or sufficient payoff statement as requested, Plaintiff, on or about August 30, 2021, and pursuant to 12 U.S.C. § 2605(e) and 12 C.F.R. § 1024.35(a), sent SLS a "notice of error" (the "1st NOE"). In her 1st NOE, Plaintiff made a second request for an accurate payoff statement ("second payoff request"). SLS received Plaintiff's first  NOE and second payoff request on September 2, 2021 but did not respond until October 19, 2021. A copy of Plaintiff's August 30, 2021 first NOE/second payoff request; and a copy the United States Postal Service's September 2, 2021 delivery confirmation of same, are attached hereto as Exhibit C.

92.     As Plaintiff did not receive a timely response to, and/or an investigation of her 1st NOE, on or about September 28, 2021, and pursuant to 12 U.S.C. § 2605(e) and 12 C.F.R. 1024.35(a), Plaintiff sent SLS a second notice of error (the "second NOE") and a third request for an accurate payoff statement (the "third payoff request"). Defendant SLS received Plaintiff's 2nd NOE on September 28, 2021. A copy of Plaintiff's September 28, 2021 second NOE is attached hereto as Exhibit D.

93.     As stated above, on October 19, 2021 SLS sent a letter to Plaintiff purporting to be a response to Plaintiff's NOEs for accurate payoff requests. As part of the response, SLS included an internal printout of the "payment histories" supposedly associated with Plaintiff's loan account.

The included listing of "payment histories" contained line items that were completely vague, just like the payoff letter line item of "Corp. Advances."  Here, the offending entry was identified merely as "Expense Advances" with no indication that the amounts of the charges contained therein are estimates or were actually incurred or even owed by Plaintiff. A copy of SLS's October 19, 2021 letter is attached hereto as Exhibit E.  Indeed, the included "Payment Transaction Codes" which were supposed to explain what the charges were for were also misleading.  In fact, the code for "Expense Advances" identifies this payment under the code "FB" which has a description of "Fee Billed."  There is no indication that such a fee was an estimate, actually incurred, or even owed by Plaintiff.

94.     The "payment histories" which comprise the "Corp. Advances" demanded in the Payoff Statement, contain fraudulent charges as well. Several charges for "Vacant Property Registration Fees" or "Register Vacant Prop" were improperly added to Plaintiffs' mortgage debt. At all times, Plaintiff occupied the Property and SLS knew the home was at all times occupied.

95.     In addition to the improper and vague charges for "Expense Advances" the "payment histories" identifies, during the period of August 3, 2009 through September 24, 2021, 142 charges for dive-by property inspections on Plaintiff's home.  Many of these purported inspections were apparently conducted less than thirty days apart, and several were conducted multiple times within a month, contrary to the mortgage agreement, servicing guidelines and applicable law.  Moreover, these needless inspections were conducted when SLS had direct knowledge Plaintiff was occupying home. In light of the fact that SLS charged Plaintiff for a vacant property, when occupied, validity and reasonableness of these inspections becomes more suspect.

## CLASS ACTION ALLEGATIONS

96.     Plaintiff brings this action individually and on behalf of all individuals similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following "National Class":

> All persons in the United States who either (1) were charged for fees that were not enumerated or explained on a payoff statement, within a category identified only as "Corp. Advances", and or (2)  were charged one or more property inspection fees through SLS's automated loan servicing platform, when they inhabited the property to be inspected and SLS was aware and on notice the property was inhabited, or were otherwise charged an inspection fee that was in violation of the applicable servicing guidelines.

97.     In addition to the national class, Plaintiff brings a subclass on behalf of Florida residents pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), the "Florida Class":

> All persons in the State of Florida who either (1) were charged for fees that were not enumerated or explained on a payoff statement, within a category identified only as "Corp. Advances", and or (2)  were charged one or more property inspection fees through SLS's automated loan servicing platform, when they inhabited the property to be inspected and SLS was aware and on notice the property was inhabited, or were otherwise charged an inspection fee that was in violation of the applicable servicing guidelines.

98.     Plaintiff reserves the right to modify or amend the proposed class definitions before the Court determines whether certification is appropriate.

99.     Excluded from the Class are persons whose Payoff Statements according to SLS records were returned as undeliverable, persons whose mortgages were for commercial purposes, not for personal, family, or household purposes, and Defendant, and any subsidiary or affiliate of Defendant, and the directors, officers and employees of Defendant or its subsidiaries or affiliates, and members of the federal judiciary.

100.     Under Fed. R. Civ. P. 23(a)(1), the proposed class is made up of at least 40 persons, the joinder of whom are impracticable except by means of a class action.  The disposition of the

claims in a class action will benefit both the parties and the Court.  The exact number of class members can be determined through discovery and review of SLS's business records.

101.    The proposed class is ascertainable because it is defined by reference to objective criteria.  In addition, and upon information and belief, the names and addresses of all members of the proposed class can be identified in business records maintained by SLS.

102.    In conformance with Fed. R. Civ. P. 23(a)(2), all Class Members' claims (including Plaintiff's) are unified in that they arise from the same improper charging and collection practices arising out of materially identical circumstances. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the proposed class.

103.    Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiff is a member of the Class. Her claims are typical of all other Class Members.  All Class Members' claims are unified, as all were victims of the same collection and charging practices.

104.    Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiff will adequately represent the class because she has interests in common with the proposed Class Members and she has retained attorneys who are experienced in class action litigation.

105.    Pursuant to Fed. R. Civ. P. 23(b)(3), there is a well-defined community of interest in the questions of law and fact involving and affecting the class to be represented by Plaintiff. Common questions of law and/or fact predominate over any questions affecting only individual members of the class.  Common questions include, but are not limited to, the following:

    a.  Whether SLS's impositions of "Corp. Advances" charges not being enumerated are deceptive, misleading and violate the FDCPA;

    b.  Whether SLS's impositions of "Corp. Advances" charges not being enumerated are deceptive, misleading and violate the FCCPA;

    c.   Whether SLS had a policy and practice of charging persons in arrears unlawful and unreasonable inspection fees;

    d.   Whether and to what extent SLS's automated servicing platform improperly ordered and charged inspection fees to Class Members;

    e.   Whether SLS's Property Inspection Fee scheme, as alleged herein, is illegal;

    f.   Whether Plaintiff and Class Members are entitled to statutory damages under the FDCPA and the amounts thereof;

    g.   Whether Plaintiff and Class Members are entitled to statutory damages under the FCCPA and the amounts thereof; and

    h.   The proper measure of disgorgement and/or actual and/or punitive damages and/or restitution, as well as other recovery to the class, including fees and costs.

106.    Further, the prosecution of separate actions by individual members of the class would create a risk of:

    a.   Inconsistent or varying adjudications concerning individual members of the class that would establish incompatible standards of conduct for the defendant opposing the class; and

    b.   Adjudication with respect to individual members of the class that would, as a practical matter, be dispositive of the interests of other members not parties to such adjudications, and/or substantially impair or impede the ability of other non-party class members to protect such individual interests.

107.    The class action method is appropriate for the fair and efficient prosecution of this action.

108.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each Class Member's claims are small relative to the complexity of the litigation, and due to the financial resources of SLS, no member of the Class could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the members of the Class will continue to suffer losses and SLS's misconduct will proceed without remedy.

109.    Even if members of the Class could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

110.    Alternatively, certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because it is clear that declaratory and injunctive relief is appropriate respecting the Classes as a whole.

## COUNT I

## VIOLATION OF THE FAIR DEBT COLLECTION ACT 15 USC § 1692e

111.    Plaintiff repeats and realleges paragraphs 1 through 95 as if fully stated herein.

112.    Plaintiff and each Class Member was a "consumer" as defined by 15 U.S.C. § 1692a(3).

113.    The mortgage loans encumbering the property of Plaintiff and Class Members, which SLS service, are debts under the FDCPA because each is "an[] obligation or alleged

obligation of a consumer to pay money arising out of a transaction . . . [that is]…primarily for personal, family, or household purposes." 15 U.S.C. § 1692a(5).

114.    Additionally, the improper fees being charged and collected, in the form of the "Corp. Advances" and "Property Inspection Fees" are incidental to the principal obligation and subject to the Act. 15 U.S.C. § 1692f(1).

115.    SLS is a "debt collector" of those mortgage loans as defined by 15 U.S.C. § 1692a(6) because it regularly attempts to collect, and collects, amounts owed or asserted to be owed or due another, including the mortgage debts from Plaintiff and Class Members via Payoff Statements. The Payoff Statement described above indeed uniformly confirmed this by identifying SLS as a debt collector. And SLS acquired the servicing rights of Plaintiff and each Class Member's mortgage after they were in default.

116.    SLS engaged in direct "communications" with Plaintiff and Class Members as defined by 15 U.S.C. § 1692a(2) when it sent them or their representatives Payoff Statements, purportedly demanding money due for reinstatement or payoff of their mortgage loans.

117.    The FDCPA creates a private right of action under 15 U.S.C. § 1692k.

118.    Congress created shared, substantive statutory rights of Plaintiff and the Class Members to be privately enforced and protected under the FDCPA, which SLS has violated. *See* 15 U.S.C. §§ 1692, 1692e, 1692f.

119.    15 U.S.C. §1692e states, in relevant part, that:

> A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
>
> ……
>
> (2) The false representation of—

(A) the character, amount, or legal status of any debt; or
(B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.
………

(10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

120.    Based on the foregoing allegations, SLS used deceptive means of collecting debts––which contained undisclosed fees for "Corp. Advances" with no itemization or description of what the charges may be for, and/or improper and unnecessary property inspection fees as heretofore described; representing in monthly loan statements and payoff statements, these fees for recurring gratuitous property inspections, ordered and scheduled by automated means, incorporating them —in violation of 15 U.S.C. § 1692e(10), because it represented them in Payoff Statements in a confusing, inaccurate manner, or in a manner that would likely mislead a consumer.

121.    Based on the foregoing allegations, SLS violated 15 U.S.C. § 1692e(2)(A) because through its Payoff Statements imposing "Corp. Advances" with no itemization or description of what the charges may be for, and/or improper and unnecessary property inspection fees as heretofore described; representing in monthly loan statements and payoff statements, these fees for recurring gratuitous property inspections, ordered and scheduled by automated means, incorporating them, it falsely or in a unclear and misleading manner stated, or misrepresented, the amount, character, or status of the amounts needed to payoff Plaintiff's and Class Members' mortgage debts.

122.    Based on the foregoing allegations, SLS violated 15 U.S.C. § 1692e(2)(B) when through its Payoff Statements imposing "Corp. Advances" with no itemization or description of what the charges may be for, and/or improper and unnecessary property inspection fees as heretofore described; representing in monthly loan statements and payoff statements, these fees

for recurring gratuitous property inspections, ordered and scheduled by automated means, it falsely or in a misleading manner stated, or mispresented, the compensation that it might lawfully receive from Plaintiff and Class Members.

123.    These violations of FDCPA caused injury to Plaintiff and Class Members by violating the foregoing substantive FDCPA rights. Specifically, SLS's violations of the FDCPA harmed Plaintiff and the Class Members by depriving them of the statutory right to accurate, clear, and conspicuous information concerning their mortgage loans. Plaintiff and the Class Members also suffered the imminent risk of having to pay an illegal amount.

124.    As a result of these violations, Plaintiff and Class Members are entitled to statutory damages together with reasonable attorney's fees and costs under 15 U.S.C. § 1692(k).

## COUNT II

## VIOLATION OF THE FAIR DEBT COLLECTION ACT 15 USC § 1692f

125.    Plaintiff repeats and realleges paragraphs 1 through 95 as if fully stated herein.

126.    Plaintiff and each Class Member were a "consumer" as defined by 15 U.S.C. § 1692a(3).

127.    The mortgage loans encumbering the property of Plaintiff and Class Members, which SLS service, are debts under the FDCPA because each is "an[] obligation or alleged obligation of a consumer to pay money arising out of a transaction . . . [that is]…primarily for personal, family, or household purposes." 15 U.S.C. § 1692a(5).

128.    Additionally, the improper fees being charged and collected, in the form of the "Corp. Advances" and "Property Inspection Fees" are incidental to the principal obligation and subject to the Act. 15 U.S.C. § 1692f(1).

129.     SLS is a "debt collector" of those mortgage loans as defined by 15 U.S.C. § 1692a(6) because it regularly attempts to collect, and collects, amounts owed or asserted to be owed or due another, including the mortgage debts from Plaintiff and Class Members via Payoff Statements. The Payoff Statement described above indeed uniformly confirmed this by identifying SLS as a debt collector. And SLS acquired the servicing rights of Plaintiff and each Class Member's mortgage after they were in default.

130.     SLS engaged in direct "communications" with Plaintiff and Class Members as defined by 15 U.S.C. § 1692a(2) when it sent them or their representatives Payoff Statements, purportedly demanding money due for reinstatement or payoff of their mortgage loans.

131.     The FDCPA creates a private right of action under 15 U.S.C. § 1692k.

132.     15 U.S.C. § 1692f states, in relevant part:

> A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
>
> (1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law

133.     Based on the foregoing allegations, SLS used unfair means of collecting amounts for "Corp. Advances" with no itemization or description of what the charges may be for, and/or improper and unnecessary property inspection fees as heretofore described; representing in monthly loan statements and payoff statements, these fees for recurring gratuitous property inspections, ordered and scheduled by automated means, incorporating them in violation of 15 U.S.C. § 1692f, because the amounts were not expressly authorized by Plaintiffs' and Class

Members' mortgage instruments creating their debts as they must be under those instruments, or they were not permitted by law.

134. These violations of FDCPA caused injury to Plaintiff and Class Members by violating the foregoing substantive FDCPA rights.

135. As a result of these violations, Plaintiff and Class Members are entitled to statutory damages together with reasonable attorneys' fees and costs under 15 U.S.C. § 1692(k).

## COUNT III

## VIOLATION OF THE FLORIDA CONSUMER COLLECTION PRACTICES ACT
## FLA STAT § 559.72(9)

136. Plaintiff repeats and realleges paragraphs 1 through 95 as if fully stated herein.

137. Section 559.72, Florida Statutes, of the FCCPA mandates that "no person" shall engage in certain practices in collecting consumer debts.

138. SLS is a "person" within the meaning of the FCCPA.

139. The mortgage loans encumbering the properties of Plaintiff and Class Members, and being serviced by SLS, are each a "debt" under the FCCPA because each one is "an[] obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." § 559.55(6), Fla. Stat.

140. The FCCPA creates a private right of action. See § 559.77, Fla. Stat.

141. The Florida Legislature created shared, substantive statutory rights of Plaintiff and Class Members to be enforced and protected privately under the FCCPA, which SLS violated. §§ 559.72, 559.72(9), 559.77, Fla. Stat.

142. Under Section 559.72, Florida Statutes,

> In collecting consumer debts, no person shall:
>
> ……
>
> (9) Claim, attempt, or threaten to enforce a debt when such person knows that the debt is not legitimate or assert the existence of some other legal right when such person knows that the right does not exist.

143.    Based on the foregoing allegations, SLS violated Section 559.72(9), Florida Statutes, by attempting to collect undisclosed fees for "Other Unpaid Expenses" with no itemization or description of what the charges may be for, incorporating them, when, as stated above, it knew that the fees, and as a corollary, the total amounts incorporating them, were not legitimate debts.

144.    Based on the foregoing allegations, SLS violated Section 559.72(9), Florida Statutes, by attempting to collect "Corp. Advances" with no itemization or description of what the charges may be for, and/or improper and unnecessary property inspection fees as heretofore described; representing in monthly loan statements and payoff statements, these fees for recurring gratuitous property inspections, ordered and scheduled by automated means, incorporating them, when, as stated above, it knew it had no legal right to collect the fees, and as a corollary, no legal right to collect the total amounts incorporating them.

145.    These collection practices by SLS hides the true character of the alleged debt owed by Plaintiff and Class Members and impairs their ability to knowingly assess the validity of the alleged debt.

146.    SLS knowingly sent the Payoff Statement and attempted to collect monies from Plaintiff and the Class Members through means that were clearly misleading on its face.

147.    These violations of FCCPA caused injury to Plaintiff and Class Members by violating the foregoing substantive FCCPA rights.

148.     As a result of these violations, Plaintiff and Class Members are entitled to statutory damages together with reasonable attorney's fees and costs under Section 559.77, Florida Statutes.

## JURY DEMAND

149.     Plaintiff respectfully requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff, on behalf of herself and the Classes, respectfully requests this Court to award against SLS in favor of Plaintiff and the Classes all of the following:

a.  Certifying Plaintiff's claims for class treatment under Federal Rules of Civil Procedure 23(a) and (b)(3), appointing Plaintiff as Class Representative, and appointing Plaintiff's attorneys as counsel for the Classes;

b.  For an order awarding compensatory and statutory damages on behalf of Plaintiff and the Classes in an amount to be proven at trial;

c.  For judgment for Plaintiff and the Classes on their federal and state law claims, in an amount to be proven at trial;

d.   For pre-judgment and post-judgment interest as provided for by law or allowed in equity;

e.  For an order awarding Plaintiff and the Classes their attorneys' fees and costs; and,

f.  Any other relief for Plaintiff and the Class the Court deems just and proper.

Dated: February 4, 2022.

By: *Scott D. Hirsch*
Scott D. Hirsch
**SCOTT HIRSCH LAW GROUP**
**Fla. Bar No. 50833**
**6810 N. State Road 7**
**Coconut Creek, FL 33073**

**Tel: (561) 569-7062**
**Email: scott@scotthirschlawgroup.com**

**THE ADVOCACY GROUP**
Jessica L. Kerr
Fla. Bar. No. 92810
100 S. Biscayne Blvd, Suite 300
Miami, FL 33131
Telephone: (954) 282-1858
Facsimile: (954) 282-8277
Email: *jkerr@advocacypa.com*

**Gustafson Gluek PLLC**
Daniel E. Gustafson, Esq.
David A. Goodwin, Esq.
Mary M. Nikolai, Esq.
Canadian Pacific Plaza
120 South 6th Street, Ste. 2600
Minneapolis, MN 55402
dgustafson@gustafsongluek.com
dgoodwin@gustafsongluek.com
mnikolai@gustafsongluek.com

*Attorneys for Plaintiff*